NATIONWIDE MUTUAL INSURANCE COMPANY v. CHARLES LEROY HAYES, SHAFER EWELL GWYN, SHAFER EWELL GWYN, ADMINISTRATOR OF THE ESTATE OF BERNICE O. GWYN, GLENICE KEY LYNCH, DONALD JOE LYNCH, DONNA CHERYLEEN LYNCH, AND GREAT AMERICAN INSURANCE COMPANY

No. 50

(Filed 12 June 1970)

**1. Insurance §§ 79, 85; Automobiles § 5— automobile insurance — non-owner's liability coverage — transfer of title**

An insured under a non-owner's liability policy whose recently purchased automobile was involved in an accident on 27 January 1968 was covered under a provision of the non-owner's policy which stated that if the insured acquired ownership of an automobile during the policy period the policy shall apply with respect to the ownership or use of the automobile "for a period of 30 days next following the date of such acquisition," the insured having acquired title to the automobile within the meaning of G.S. 20-72(b) on 28 December 1967, where the evidence was to the effect (1) that the

seller of the automobile delivered it to the insured on 26 or 27 December 1967 and received a check in full payment on 27 December 1967 and (2) that the seller on 28 December 1967 signed the certificate of title and delivered it to the insured's employer and that insured also signed the title certificate on 28 December 1967 and purchased his license tags.

**2. Automobiles § 5— transfer of automobile title — pre-1961 law**

Prior to 1961, a purchaser of a motor vehicle could acquire title or ownership without delivery of an executed certificate of title by the vendor and without applying for a new certificate to the Department of Motor Vehicles.

**3. Automobiles § 5— transfer of automobile title — 1963 amendment to G.S. 20-72(b) — "title" and "ownership"**

The General Assembly used the word "title" as a synonym for "ownership" in enacting the 1963 amendment to G.S. 20-72(b) which provides that "no title to any motor vehicle shall pass or vest until such assignment is executed and the motor vehicle delivered to the transferee."

**4. Insurance § 80— automobile insurance — financial responsibility — "owner" of automobile**

The Financial Responsibility Act of 1953 fixes the requirement that financial responsibility be maintained by the owner of an automobile, which includes the holder of title and a mortgagor, conditional vendee or lessee having right of purchase and right of possession. G.S. 20-279.1 et seq.

**5. Insurance § 80— automobile insurance — purpose of Financial Responsibility Act**

The purpose of the Financial Responsibility Act is to provide protection from damages or injuries resulting from the negligent operation of automobiles.

**6. Automobiles § 5; Insurance § 80— ownership of motor vehicle — controlling statute**

The provisions of G.S. 20-72(b), as amended in 1963, are controlling as to the ownership of a motor vehicle for purposes of tort liability and insurance coverage; these provisions do not conflict with the provisions of the Financial Responsibility Act of 1953, but rather they strengthen and complement the Act.

**7. Automobiles § 5; Uniform Commercial Code § 16— transfer of automobile title — what law controls**

For purposes of tort law and liability insurance coverage, the specific provisions of the Motor Vehicle Act relating to the transfer of ownership of motor vehicles must prevail over the provisions of the Uniform Commercial Code relating to passing of title to property generally described as "goods." G.S. 20-72, G.S. 25-2-401.

**8. Uniform Commercial Code § 4; Automobiles § 5— documents of title — motor vehicle titles**

The documents of title referred to in the Uniform Commercial Code do not include certificates of title to motor vehicles. G.S. 25-2-401.

**9. Automobiles § 5— transfer of automobile title — mandatory requirements**

The requirements governing transfer of legal title and ownership to a motor vehicle are mandatory. G.S. 20-72(b).

**10. Uniform Commercial Code §§ 1, 3— scope of application — public regulations**

The Uniform Commercial Code generally covers transactions in personal property and is particularly related to negotiable instruments, bills of lading and sales in general; the Code is not necessarily applicable to public regulations unless the court chooses to make it so.

**11. Uniform Commercial Code § 6; Statutes § 11— laws not repealed — statute relating to transfer of automobile title**

Where the Uniform Commercial Code contains a specific repealer as to ten separate acts of the General Assembly, but the repealer does not mention the Motor Vehicles Act, it would require a strained interpretation to hold that it was the intention of the General Assembly to repeal the provisions of G.S. 20-72 relating to the transfer of ownership of motor vehicles. G.S. 25-10-102.

**12. Automobiles § 5— transfer of title — post-1963 law**

After 1 July 1963 for purposes of tort law and liability insurance coverage, no ownership passes to the purchaser of a motor vehicle which requires registration under the Motor Vehicle Act of 1937 until (1) the owner executes, in the presence of a person authorized to administer oaths, an assignment and warranty of title on the reverse of the certificate of title, including the name and address of the transferee, (2) there is an actual or constructive delivery of the motor vehicle, and (3) the duly assigned certificate of title is delivered to the transferee; in the event a security interest is obtained in the motor vehicle from the transferee, the requirement of delivery of the assigned certificate of title is met by delivering it to the lien holder. G.S. 20-72(b), as amended in 1963.

ON *certiorari* to the Court of Appeals to review its decision in 7 N.C. App. 294.

This case was heard before Johnston, J., at the 2 September 1969 Civil Session of Surry County.

This action for declaratory judgment was instituted by plaintiff, Nationwide Mutual Insurance Company (Nationwide), which sought a declaration that no coverage was afforded by it to Charles Leroy Hayes (Hayes) relative to actions instituted by the individual defendants named herein to recover damages for personal injuries and wrongful death resulting from an automobile accident on 27 January 1968. Plaintiff asserts that insurance coverage was afforded by Great American Insurance Company (Great American). Defendant Great American contends that Hayes had not acquired ownership of the vehicle he was driving in the accident until 28 December

1967; that the accident occurred 27 January 1968, and that therefore coverage was afforded by Nationwide under its "non-owner's" policy issued to Hayes.

The "non-owner's" policy, a policy issued to one who does not own an automobile, was issued to Hayes by Nationwide pursuant to assignment from the North Carolina Automobile Assigned Risk Plan, for the period 14 December 1967 to 14 December 1968. The policy, *inter alia,* contained the following:

"3.  If the Policyholder (Named Insured) acquires ownership of an automobile or land motor vehicle during the policy period, the insurance hereunder shall nevertheless apply with respect to the ownership, maintenance or use of such automobile or land motor vehicle for a period of 30 days next following the date of such acquisition; provided that the insurance shall not apply beyond the effective date and time that any other insurance is available to the Insured (those entitled to protection) with respect to such automobile or land motor vehicle or would be available but for the existence of this insurance."

Mr. Luther Chappell of the Surry Insurance Agency and Realty Company (Surry Agency), Dobson, North Carolina, was the producer of record of the assigned risk policy which was assigned to Nationwide and numbered No. 61 686 428.

Hayes had negotiated the sale of a 1959 Pontiac automobile from one Bertie George. Harold Hodges, Hayes' employer, agreed to furnish the money for the purchase of the automobile. The automobile was delivered to Hodges' warehouse on 26 or 27 December 1967, at which time Mr. George removed the license tags. A check dated 27 December 1967, in the amount of $450.00, was delivered to the seller on 27 December 1967, *and on 28 December 1967 seller signed the certificate of title and delivered it to Mr. Hodges. Hayes also signed the title certificate on 28 December 1967, the day he purchased his license tags.*

Mr. Hodges contacted the Surry Agency on 27 December 1967 and on 28 December 1967 and informed the agency that Hayes had a non-owner's policy with them (actually with Nationwide), that he (Hodges) had made arrangements for Hayes to obtain a car and that Hayes wanted to change his policy from a non-owner's policy to an owner's policy. The Surry Agency subsequently sent Hayes forms necessary for him to obtain license plates on the Pontiac.

Hayes was involved in a collision with a 1965 Pontiac auto-

mobile operated by Shafer Ewell Gwyn on U. S. Highway 52 in Surry County at approximately 11:52 A. M. 27 January 1968. Great American had a policy (No. 450 34 60) covering Gwyn's automobile at the time of the accident and providing protection against uninsured motorists.

Surry Agency did not notify Nationwide to convert the non-owner's policy to an owner's policy until 30 January 1968. A memorandum to Nationwide from Chappell stated:

January 30, 1968

"In reference to the above policy this is to advise that the insured bought a 1959 Pontiac 2 Door convertible, Serial No. 159W13860 on December 27, 1967. The insured's employer, H. Y. Hodges, stated that he called our office on December 27 and asked that the policy be converted from a non-owner to cover on this vehicle. We have no record, or knowledge of receiving this call.

"This policy should be converted from the non-owner to cover on this vehicle as of December 27. Please advise the difference in the premium for this change.

"The insured was driving the vehicle and was involved in an accident on January 27.

"Awaiting your reply.

Signed: Luther Chappell."

A reply, written on the same memorandum, and dated 2/2/68, indicated that Nationwide was converting the policy from a non-owner's policy to an owner's policy effective 1 February 1968, the date it received the memorandum. The reply indicated that Nationwide could not back-date the change (as requested).

Gwyn and several passengers in his car at the time of the accident have filed civil actions against Hayes, seeking to recover for personal injuries and other damages.

The cause came on for hearing and was heard by Johnston, J., without a jury, pursuant to agreement of the parties. Judge Johnston heard the evidence, made full findings of fact, reached conclusions of law, and entered judgment. Pertinent portions of the conclusions of law reached and of the judgment are quoted below.

"II. Charles Leroy Hayes acquired ownership of the 1959 Pontiac automobile involved in the accident more than 30 days prior to occurrence of the accident.

"III. No coverage is afforded to Charles Leroy Hayes by Nationwide as to claims arising out of the accident of January 27, 1968; and Nationwide has no obligation to defend Charles Leroy Hayes in said actions.

"IV. Charles Leroy Hayes was uninsured at the time of said accident, and therefore the uninsured motorist coverage of the Great American Insurance Company policy is applicable to claims arising out of said accident by Shafer Ewell Gwyn and passengers in the Gwyn automobile."

"NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Nationwide Mutual Insurance Company affords no coverage to and has no obligation to defend claims arising out of an automobile accident which occurred on January 27, 1968 between a 1959 Pontiac automobile owned by Charles Leroy Hayes and a 1965 Pontiac automobile owned by Shafer Ewell Gwyn; that the uninsured motorist coverage afforded under a policy of insurance issued by Great American Insurance Company to Shafer Ewell Gwyn is applicable to claims of Shafer Ewell Gwyn and his passengers arising out of said accident. . . ."

Defendant Great American appealed to the Court of Appeals. The Court of Appeals reversed the trial court. Plaintiff Nationwide and defendants Shafer Gwyn, Shafer Gwyn, Administrator of the Estate of Bernice O. Gwyn, Glenice K. Lynch, Donald J. Lynch, and Donna C. Lynch petitioned this Court for a writ of certiorari to review the decision of the Court of Appeals pursuant to G.S. 7A-31 and Rule 2 of the Supplementary Rules of the Supreme Court. By order dated 9 April 1970 the petition was allowed.

*Folger and Folger by Fred Folger, Jr., for defendant appellants, Shafer Ewell Gwyn, Shafer Ewell Gwyn, Administrator of the Estate of Bernice O. Gwyn, Glenice Key Lynch, Donald Joe Lynch, and Donna Cheryleen Lynch.*

*Hudson, Petree, Stockton, Stockton & Robinson by J. Robert Elster, for plaintiff Nationwide Mutual Insurance Company, appellant.*

*Womble, Carlyle, Sandridge and Rice by Allan R. Gitter and Jimmy H. Barnhill, for Great American Insurance Company, appellee.*

BRANCH, J.

[1] Plaintiff seeks an adjudication as to which of the two insur-

ance policies afforded coverage for claims against Hayes growing out of the accident which occurred on 27 January 1968. This question will be determined by fixing the date on which Hayes acquired ownership of the Pontiac automobile which he was operating at the time of the accident. If Hayes acquired ownership of the automobile before December 28, the collision occurred more than 30 days from the time he acquired the automobile, and the protection under Gwyn's uninsured motorists insurance would apply. Conversely, if ownership of the automobile was acquired on or after the 28th day of December, 1968, the accident occurred within 30 days of the acquisition and Hayes' non-owner's policy would apply. In order to fix the date of acquisition of ownership of the automobile, we must decide whether in this state a purchaser may acquire ownership of a motor vehicle before purchaser and seller have fully met the requirements of G.S. 20-72(b).

[2]    Prior to 1961, a purchaser of a motor vehicle could acquire title or ownership without delivery of an executed certificate of title by the vendor and without applying for a new certificate to the Department of Motor Vehicles. *Finance Co. v. Pittman*, 253 N.C. 550, 117 S.E. 2d 423. However, in 1961 the General Assembly amended G.S. 20-72(b) so that it read as follows:

"Sec. 20-72.  TRANSFER BY OWNER. — * * *

"(b)  The owner of any vehicle registered under the foregoing provisions of this article, transferring or assigning his title or interest thereto, shall also endorse an assignment and warranty of title, including in such endorsement the name and address of the transferee and the date of transfer, in form approved by the Department upon the reverse side of the certificate of title or execute an assignment and warranty of title of such vehicle and a statement of all liens or encumbrances thereon, which statement shall be verified under oath by the owner, who shall deliver the certificate of title to the purchaser or transferee at the time of delivering the vehicle, except that where deed of trust, mortgage, conditional sale or title retaining contract is obtained from purchaser or transferee in payment of purchase price or otherwise, the lien holder shall forward such · certificate of title papers to the Department within twenty days together with necessary fees, or deliver such papers to the purchaser at the time of delivering the vehicle, as he may elect, but· in either event the penalty provided in Sec. 20-74 shall apply if application for transfer is not made within twenty days. Any owner

selling or transferring his interest to a motor vehicle who willfully fails or refuses to endorse an assignment of title and any person who delivers or accepts a certificate of title endorsed in blank shall be guilty of a misdemeanor. *Transfer of ownership in a vehicle by an owner is not effective until the provisions of this section have been complied with."* (Emphasis ours)

The case of *Insurance Company v. Insurance Company,* 276 N.C. 243, 172 S.E. 2d 55, construed this section as amended by the General Assembly of 1961. In that case the vendor agreed to sell an automobile to one John W. Zimmerman, and on 25 May 1963 delivered the automobile to John's home and removed the dealer license plate. The vendor had liability insurance with the defendant insurance company which covered vendor, its officers, agents and "any person while using an owned automobile — provided the actual use of the automobile is by the named insured or with his permission . . . ." On 27 May 1963, James Zimmerman, brother of John Zimmerman, was driving the automobile with John's permission and was involved in an accident. Prior to the date of the accident, plaintiff insurance company had issued to James Zimmerman an assigned risk insurance policy on an automobile belonging to him, which policy was in effect at the time of the accident. On 28 May vendor executed and delivered the certificate of title to John Zimmerman. Civil action was instituted against James Zimmerman for claims arising from the accident. Plaintiff insurance company instituted action under the Declaratory Judgment Act for a declaration of its rights. This Court, holding that the ownership of the automobile remained in the vendor on the date of the accident stated:

"The Legislature took positive action on 15 June 1961 to include in our statutes this 'pivotal provision' lacking in 1925 by amending G.S. 20-72(b) and G.S. 20-75, effective 1 July 1961 to provide: 'Transfer of ownership in a vehicle by an owner (by a dealer) is not effective until the provisions of this subsection have been complied with.'

"We hold therefore that after 1 July 1961, the effective date of the amendments, no title passed to the purchaser of a motor vehicle until (1) the certificate of title has been assigned by the vendor, (2) delivered to the vendee or his agent, and (3) application made for a new certificate of title. This accords with prior decisions in *Bank v. Motor Co., supra,* and *Credit Co. v. Norwood, supra."*

Had there been no later change in the statutory law, in view of the fact that here delivery had occurred, *Insurance Company v. In-*

*surance Company, supra,* would unquestionably be controlling precedent for decision in instant case. However, in that case the Court noted that the statute (G.S. 20-72(b)) had been materially changed by the 1963 amendment. Decision in the cause now before us must be made pursuant to G.S. 20-72(b), as amended by the General Assembly in 1963, which provides:

"(b)  In order to assign or transfer title or interest in any motor vehicle registered under the provisions of this article, the owner shall execute in the presence of a person authorized to administer oaths an assignment and warranty of title on the reverse of the certificate of title in form approved by the Department, including in such assignment the name and address of the transferee; *and no title to any . . . motor vehicle shall pass or vest until such assignment is executed and the motor vehicle delivered to the transferee.* The provisions of this section shall not apply to any foreclosure or repossession under a chattel mortgage or conditional sales contract or any judicial sale. (Emphasis ours)

"Any person transferring title or interest in a motor vehicle shall deliver the certificate of title duly assigned in accordance with the foregoing provision to the transferee at the time of delivering the vehicle, except that where a security interest is obtained in the motor vehicle from the transferee in payment of the purchase price or otherwise, the transferor shall deliver the certificate of title to the lienholder . . . ."

Appellant Insurance Company contends that the 1963 legislature intended to amend G.S. 20-72(b) so as to make it clear that its provisions applied only to formal transfer of title as related to lien law and no longer applied to the transfer of ownership of a motor vehicle for the purposes of tort liability and insurance coverage. In support of this position appellant argues that the 1963 amendment resulted from legislative reaction to the decision in *Home Indemnity Co. v. Motor Co.,* 258 N.C. 647, 129 S.E. 2d 248, and that the use of the word "title" in lieu of "ownership" is indicative of the legislature's intent.

Webster's Third New International Dictionary defines "title" as follows: "2a:  The union of all the elements constituting legal ownership and being divided in common law into possession, right of possession, and right of exclusive possession; the body of facts or events that give rise to the ownership of real or personal property." It defines "owner" as: "One that owns, one that has the legal or rightful title whether the possessor or not."

In *Frank v. Forgotston*, 61 N.Y.S. 1118, 30 Misc. Rep. 816, it is stated: "The 'title to certain goods and chattels' means the right to the property, and the right of possession thereof, — in short, the ownership thereof . . . ."

In the case of *Skelly Oil Co. v. Kelly*, 134 Kansas 176, 5 P. 2d 823, the Court said:

> "The word title has a variety of meanings. It sometimes connotes the means by which property in lands is established, as in the expression 'chain of title.' It sometimes means 'property' or 'ownership' in the sense of the interest one has in land. A common meaning is complete ownership, in the sense of all the rights, privileges, powers, and immunities an owner may have with respect to land. (Am. Law. Inst., Restatement of the Law of Property, draft No. 1; introduction.)"

It is noted that in the case of *Insurance Co. v. Insurance Co., supra*, the Court, construing G.S. 20-72(b) when it contained the provision, "Transfer of ownership in a vehicle by an owner is not effective until the provisions of this subsection have been complied with," stated:

> "We hold therefore that after 1 July 1961, the effective date of the amendments, no *title* passed to the purchaser of a motor vehicle until (1) the certificate of title has been assigned by the vendor, (2) delivered to the vendee or his agent, and (3) application made for a new certificate of title. This accords with prior decisions in *Bank v. Motor Co., supra*, and *Credit Co. v. Norwood, supra*." (Emphasis ours)

It is conceded that the legislature may have intended to clarify some questions raised by the dictum in the case of *Home Indemnity Co. v. Motor Co., supra*, when it enacted the 1963 amendment, so as to delete the language "or execute an assignment and warranty of title of such vehicle and a statement of all liens or encumbrances thereon, which statement shall be verified under oath by the owner," and further clarify the provisions of the statute when liens are involved. It is of interest to note that in *Home Indemnity Company v. Motor Co.*, the Court used the term "vesting of title," interchangeably with "transfer of ownership." The contention that the 1963 amendment changed the meaning of G.S. 29-72(b) so that it applied only to formal transfer of title as related to lien law, however, is negated by the fact that the amendment appears in Chapter 20 under "Part 4. Transfer of Title or Interest." The perfection, assessment and release of liens on motor vehicles appears in Chapter 20

under "Part 3. Registration and Certificates of Titles of Motor Vevicles."

**[3]** The words "title" and "ownership" are words that may be used interchangeably, and we are of the opinion that the legislature in enacting the 1963 amendment to G.S. 20-72(b) used the word "title" as a synonym for the word "ownership."

Appellant further argues that to interpret that portion of the provisions of G.S. 20-72(b) which states, "and *no title* to any motor vehicle shall pass or vest until such assignment is executed and the motor vehicle delivered to transferee" to mean that *no ownership* of the motor vehicle shall pass, would create a direct conflict with the Financial Responsibility Act of 1953. G.S. 20-279.1, *et seq.*

G.S. 20-279.1 defines "owner" as follows:

"A person who holds the legal title of a motor vehicle, or in the event a motor vehicle is the subject of an agreement for the conditional sale or lease thereof with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee, or in the event a mortgagor of a vehicle is entitled to possession, then such conditional vendee or lessee or mortgagor shall be deemed the owner for the purposes of this article."

**[4]** The Financial Responsibility Act fixes the requirement that financial responsibility be maintained by the owner, which includes the holder of title and a mortgagor, conditional vendee or lessee having right of purchase and right of possession. See *Indiana Lumberman's Mutual Ins. Co. v. Parton,* 147 F. Supp. 887 (M.D.N.C. 1957). G.S. 20-38 defines "owner" under the Motor Vehicles Act and G.S. 20-279.1 defines "owner" essentially the same way.

**[5]** In nearly every instance the holder of the legal title becomes a mortgagor, conditional vendee or lessee by virtue of engaging in security transactions involving the motor vehicle. The purpose of the Financial Responsibility Act is to provide protection from damages or injuries resulting from the negligent operation of automobiles. Thus in order to protect the public and close all avenues of escape from its provisions, the legislature broadly defines "owner" in the Financial Responsibility Act. Any possible conflict between the provisions of the Financial Responsibility Act and the provisions of G.S. 20-72(b) as related to security transactions is further diminished by the passage of the 1961 amendment to G.S. 20-58, which

required all security interests relative to motor vehicles to be fixed on the certificate of title.

Certainly the definition of "owner" as the holder of the legal title is compatible with G.S. 20-72(b), requiring the vendor to execute an assignment and warranty of title on the reverse of the certificate of title in order to assign or transfer any interest in the motor vehicle.

Under the provisions of G.S. 20-50 the owner must register an automobile, obtain a certificate of title therefor, and attach registration plates to the vehicle before the vehicle can be lawfully operated. The owner must show financial responsibility at the time of registration and thereafter maintain such financial responsibility throughout the period of registration. G.S. 20-309; *Swain v. Ins. Co.,* 253 N.C. 120, 116 S.E. 2d 482. If the owner sells the motor vehicle, he must remove the license plates, endorse the registration card and return the card and plates to the Department of Motor Vehicles, G.S.20-72(a); provided that he may retain the plates, to be assigned to another vehicle owned by him. G.S. 20-64.

**[6]** We fail to see that any material conflict will arise between the Financial Responsibility Act and G.S. 20-72(b), as amended by the legislature of 1963, by holding G.S. 20-72(b) to be controlling as to ownership of a motor vehicle for purposes of tort liability and insurance coverage. Rather, such an interpretation would strengthen and complement the purposes of the Financial Responsibility Act of 1953.

**[7]** Finally, appellant contends that the Uniform Commercial Code overrides the provisions of G.S. 20-72(b) relative to transfer of ownership of automobiles as affecting tort liability and insurance coverage.

The Uniform Commercial Code became effective at midnight June 30, 1967. G.S. 25-2-401 provides in part:

> "Each provision of this article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. . . . (2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading.
>
> (a)  if the contract requires or authorizes the seller to send

the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(b) if the contract requires delivery at destination, title passes on tender there."

**[8]** The documents of title referred to in the Uniform Commercial Code do not include certificates of title to motor vehicles. *Semple v. State Farm Mutual Automobile Insurance Company*, 215 F. Supp. 645, (E.D. Pa. 1963)'.

The most basic departure from previous law which is found in the Uniform Commercial Code is the abandonment of the concept of title as a tool for resolving sales problems. This departure is evidenced by G.S. 25-2-401 which, in effect, holds that title to goods passes from the seller to the buyer when the goods are delivered to the buyer.

Whether title to an automobile can pass pursuant to the terms of the Uniform Commercial Code and without compliance with pre-existing motor vehicle regulations and transfer statutes, is a question of first impression in North Carolina. Other states are divided on the question.

Some jurisdictions hold that title passes pursuant to the provisions of the Uniform Commercial Code, particularly section 2-401(2), upon physical delivery of the vehicle, without completion of the statutory registration formalities. *Semple v. State Farm Mutual Automobile Insurance Co., supra; Motors Insurance Corp. v. Safeco Insurance Co. of America*, 412 S.W. 2d 584 (Ky.); *Park County Implement Co. v. Craig*, 397 P. 2d 800 (Wyo.); *Indiana Insurance Co. v. Fidelity General Insurance Co.*, 393 F. 2d 204 (7th Cir. 1968); *Knotts v. Safeco Insurance Co of America*, 78 N.M. 395, 432 P. 2d 106.

In the case of *Motors Insurance Corporation v. Safeco Insurance Company, supra,* a purchaser and an automobile dealer agreed on a trade which they both understood to be firm and final. The buyer was given possession of the automobile and all that remained to be done was to process the title papers and for the buyer to pay the remaining cash due. That evening the buyer's son wrecked the car. The court held that the car was not owned by the car dealer at the time of the accident within the meaning of the car dealer's insurance policy, and held that under Code Sec. 2-401 title passed at the time and place of delivery. This case is distinguishable from instant case in that the. Kentucky statute is not one that contained mandatory

requirements concerning transfer of title to motor vehicles. The statute has been interpretated by the Kentucky court in the case of *Campbell v. State Farm Insurance Company*, 346 S.W. 2d 775 (Ky.), which held that failure to register transfer did not void the sale of an automobile under Kentucky's statute KRS 186-190.

In *Semple v. State Farm Mutual Automobile Insurance Company, supra,* the Pennsylvania law was applied in an automobile purchaser's suit against the seller's insurance company for the amount of a jury verdict arising from personal injuries caused by the buyer's operation of a motor vehicle. The seller agreed to sell the car to the buyer, and later the same night the buyer paid the purchase price to the seller. The seller gave the buyer the car keys and a certificate of title bearing seller's signature at the appropriate place. They agreed to appear before a notary public some hours later for the buyer to swear to the assignment of the certificate of title. Before that time, however, the buyer drove the car and injured a third party. In holding that the seller's insurer was not liable the Court said that under the Uniform Commercial Code, Section 2-401(2), title passed to the buyer when the seller gave the keys to the buyer, because "this constituted physical delivery of the goods." The Court further held that failure to comply with the formalities of the Pennsylvania Vehicles Code for transferring title was not controlling, because the primary purpose of the Pennsylvania Motor Vehicle Act was not to establish the ownership or proprietorship of an automobile, but rather to register the name and address of the person having the right to possession, and that therefore the statute did not prevent the actual transfer of ownership. It is apparent that this case is also distinguishable from the instant case, because of the differences in the statute relating to transfer of ownership of motor vehicles.

Most of the cases constituting this line of authority are from states which do not have statutes providing a mandatory and exclusive method of transferring title to motor vehicles. However, there are cases, such as *Park County Implement Co. v. Craig, supra,* which hold that title may pass notwithstanding failure to comply with their state motor vehicle acts containing provisions which appear to be mandatory. In that case, defendants ordered a truck chassis and cab from plaintiff and were informed that such vehicle was at the International Harvester Company in Billings, Montana. The purchaser, defendant, was a Wyoming resident; he went to Montana, received delivery of the vehicle, but did not receive any evidence of ownership or title. Defendant transferred the vehicle to Wyoming, installed

a hoist and a dump bed upon it. Thereafter the chassis and cab were destroyed by fire. The court, applying the Wyoming law, held that the transaction was controlled by the sales article of the Uniform Commercial Code and that when purchaser accepted the vehicle and altered it, he became liable to pay the contract price. The court further stated that even if there were merit to defendant's contention relating to various provisions of the motor vehicle law requiring certificates of title to be issued, "the rights of the parties under the Code do not depend upon title." Although the court did not mention any specific motor vehicle statute, the statute, Sec. 31-37(a), specifically states: "The owner of a motor vehicle for which a certificate of title is required hereunder, shall not, after 31 December 1935, sell or transfer his title or interest in or to such vehicle unless he shall . . . in every respect comply with the requirements of this section." Section (b) requires an assignment and warranty of title upon the certificate, a statement of all liens and encumbrances, *verified under oath by the owner,* and delivery of the certificate at time of delivery of the vehicle to transferee.

In other jurisdictions there is authority that the question of ownership is a matter for the jury and that the jury should be instructed as to the provisions of the Uniform Commercial Code along with other evidence of ownership, including certificates of title. *Indiana Ins. Co. v. Fidelity General Ins. Co., supra; Metropolitan Auto Sales v. Koneski,* 252 Md. 145, 249 A. 2d 141.

A South Carolina statute, § 46-150.15, Code 1962, provides:

"§ 46-150.15. How voluntary transfer carried out; when transfer effective. — If an owner, manufacturer or dealer transfers his interest in a vehicle other than by the creation of a security interest, he shall, at the time of the delivery of the vehicle, execute an assignment and warranty of title to transferee in the space provided therefor on the certificate or as the Department prescribes and cause the certificate and assignment to be mailed or delivered to the transferee or to the Department.

Except as provided in § 46-150.16, the transferee shall, promptly after delivery to him of the vehicle, execute the application for a new certificate of title in the space provided therefor on the certificate or as the Department prescribes and cause the certificate and application to be mailed or delivered to the Department.

Except as provided in § 46-150.14, *and as between the parties,* a transfer by an owner is not effective until the provisions of

this section have been complied with. (1957 (50) 595.) (Emphasis ours)

In construing this statute, the courts have held that title to a motor vehicle passes to a purchaser notwithstanding the want of compliance with the title certificate law. *St. Paul Fire and Marine Ins. Co. v. Boykin,* 251 S.C. 236, 161 S.E. 2d 818. However, the passage of title is effective only as between the parties, and does not affect the rights of third party insurance carriers. *Lynch v. United States Branch, Gen. Acc. F. & L. Assur. Corp.,* 327 F. 2d 328, (4th Cir. 1964)

Many other courts have recently examined the question of when ownership of a motor vehicle passes and have held that ownership does not pass until requirements of the motor vehicle statutes have been complied with. In most of the cases hereinafter cited such ruling was made without mention of the Uniform Commercial Code, although in each case the Uniform Commercial Code had been enacted. *Roe v. Flamegas Industrial Corporation,* 16 Mich. App. 210, 167 N.W. 2d 835; *Forman v. Anderson,* 183 Neb. 715, 163 N.W. 2d 894; *McIntosh v. White,* 447 S.W. 2d 75 (Mo.); *Irion v. Glens Falls Ins. Co.,* 461 P. 2d 199 (Mont.); *Merchants Produce Bank v. Mack Trucks, Inc.,* 411 F. 2d 1174 (8th Cir., 1969); *Melton v. Prickett,* 203 Kan. 501, 456 P. 2d 34.

In the case of *Forman v. Anderson, supra,* plaintiff husband sued for personal injuries suffered by his wife and property damages inflicted to the automobile which his wife was driving when the accident occurred. Title to the motor vehicle was in the joint names of the husband and his wife. The evidence showed that the wife's negligence contributed to the accident. At the time of the accident the Nebraska law provided by Section 60-105 RRS 1943: "No person . . . acquiring a motor vehicle . . . shall acquire any right, title, claim or interest in or to such motor vehicle . . . until he shall have had issued to him a certificate of title to such motor vehicle . . . . No court in any case at law or in equity shall recognize the right, title, claim or interest of any person in or to any motor vehicle . . . unless evidenced by a certificate of title . . . duly issued in accordance with the provisions of this act." The court, in holding that the wife's contributory negligence was imputed to the husband, stated:

"In *Turpin v. Standard Reliance Ins. Co.,* 169 Neb. 233, 99 N.W. 2d 26, this court said: 'The purpose of the act relating to transfers and titles to motor vehicles is to provide means of iden-

tifying motor vehicles, to ascertain the owners thereof, to prevent theft of motor vehicles, and to prevent fraud.

"A certificate of title to a motor vehicle is generally conclusive evidence in this state of the ownership of the vehicle."

It is noted that although the Uniform Commercial Code is not mentioned, it was adopted in Nebraska in 1965 and included Section 2-401.

*Roe v. Flamegas Industrial Corp., supra,* is a case in which plaintiff sued to enforce an oral agreement to purchase a truck whereby he contended that he was to pay $50 per week until the truck was paid for. Defendant contended that payments were for rent of the truck. The Michigan statute required that every retail installment sale be in writing, that the certificate of title name the owner and security interest holder, and that the certificate of title be properly endorsed and delivered to transferee. The Michigan Court of Appeals held that the oral contract of purchase was void and that defendant must return the payments made. Michigan had previously adopted the Uniform Commercial Code, including Section 2-401.

In the case of *In re Schlutt,* 5 U.C.C. Rep. 1177, (W. D. Mich., 1968), a bankruptcy proceeding, the trustee in bankruptcy filed petition praying that Community Contract Corporation's and Ray's Auto Sales' interests be declared invalid and that the trustee hold a motor vehicle free of any interest of the respondents.

The bankrupt and his wife entered into a security agreement with Ray's Auto Sales on 9 June 1967, and made a down-payment of $375.00 plus $50 as a credit for a trade-in on an old car. The agreement was assigned with recourse to respondent, Community Contract Corporation. The down-payment was not actually made until 15 July 1967, at which time the bankrupt presented proof of insurability to the seller. "On that date, a statement of Motor Vehicle Sale was prepared and signed by Ray's and the Schlutts and the assignment of the vehicle certificate of title and application for new title were executed." The application showed the lien interest of Community Contract Corporation and was filed with the Secretary of State on 25 July 1967. A financing statement was filed in the office of the Register of Deeds of the county in which bankrupt resided on 15 June 1967. On 23 June 1967, Schlutt filed a voluntary petition for adjudication as a bankrupt. Later, the car was demolished and the value of the vehicle was paid to the respondent. The trustee contended the sale occurred on 9 June 1967 and that since the security interest was not perfected with the Secretary of State until

25 July, the respondents' rights were subordinated to the rights of the trustee pursuant to section 9-302(4) of the Uniform Commercial Code.

Respondents contended that the sale took place 15 July. Bankrupt contended there was no sale, that the trustee had no interest except for a claim for the moneys the bankrupt paid on the car. The court, holding that no sale took place until after the date of the bankruptcy, considered Section 2-106(1) and Section 2-401 of the Uniform Commercial Code, and found that notwithstanding delivery of the automobile on 9 June, the intent of the parties was not to complete the sale at that time. The court further stated:

"In any event, any sale on June 9th would have been void. In *Vriesman v. Ross,* 9 Mich. App. 97 (1967) the court set forth the Michigan law on the sale of motor vehicles, at pp 105-106:

" 'In this state the statutory language is explicit as to the requisites necessary for transferring legal title of a vehicle. Therefore in answering the plaintiff's first question we look to the pertinent provisions of CLS 1956, Section 257.233(d), as amended by PA 1959, #250 (Statutes Annotated 1960 Rev § 9.1933(d)) to determine whether the alleged transfer was validly accomplished. It reads as follows:

" ' "The owner *shall* endorse on the back of the certificate of title an assignment thereof with warranty of title in the form printed thereon with a statement of all liens or encumbrances on said vehicle, *sworn to before a notary public or some other person authorized by law to take acknowledgments,* and deliver the same to the purchaser or transferee at the time of the delivery to him of such vehicle, which shall show the payment or satisfaction of any mortgage or lien as shown on the original title." ' (emphasis supplied)

"The requirements of the statute are in mandatory terms, and case law has made it abundantly clear that failure to comply with the provisions negates the validity of the attempted transfer. See *Waldron vs. Drury's Van Lines, Inc.* (1965), 1 Mich. App. 601; *Drettman vs Marchand* (1953), 337 Mich. 1."

See: *Dodson v. Imperial Motors, Inc.,* 295 F. 2d 609 (6th Cir., 1961) to same effect.

Thus, at the date of bankruptcy, when the trustee's rights accrued, the sale of the vehicle, if any, was void as to the trustee.

Other cases following this line of authority after the Uniform Commercial Code had been adopted in those jurisdictions include:

*Irion v. Glens Falls Insurance Co.,* (Mont.) *supra; Merchants-Produce Bank v. Mack Trucks, Inc.,* (8th Cir.), *supra; Melton v. Prickett,* (Kan.), *supra.*

**[9]**    In North Carolina, by explicit terms of the statute and by interpretation of this Court, there are definite and mandatory requirements governing transfer of legal title and ownership to a motor vehicle. G.S. 20-72(b); *Insurance Company v. Insurance Company, supra.*

The Uniform Commercial Code was adopted after the passage and enactment of pertinent amendments to G.S. 20-72(b), and contains the following:

"§ 25-10-102.   Special repealer; provision for transition. —

(1)    The following acts and all other acts and parts of acts inconsistent herewith are hereby repealed:

   Uniform Negotiable Instruments Act, G.S. 25-1 through G.S. 25-199.

   Uniform Warehouse Receipts Act, G.S. 27-1 through G.S. 27-53.

   Uniform Bills of Lading Act, G.S. 21-1 through G.S. 21-41.

   Uniform Stock Transfer Act, G.S. 55-75 through G.S. 55-98.

   Uniform Trust Receipts Act, G.S. 45-46 through G.S. 45-66.

   Agricultural liens for advances, G.S. 44-52 through G.S. 44-64.

   Bank collections, G.S. 53-57 and 53-58.

   Bulk sales, G.S. 39-23.

   Factor's lien acts, G.S. 44-70 through G.S. 44-76.

   Assignment of accounts receivable, G.S. 44-77 through G.S. 44-85.

(2)    Transactions validly entered into before July 1, 1967, and the rights, duties, and interests flowing from them remain valid thereafter and may be terminated, completed, consummated or enforced as required or permitted by any statute or other law amended or repealed by this act as though such repeal or amendment had not occurred."

"§ 25-10-103.   General repealer. — Except as provided in the following section, all acts and parts of acts inconsistent with this act are hereby repealed."

**[10]**    The Uniform Commercial Code, in general, covers transac-

tions in personal property and is particularly related to negotiable instruments, bills of lading and sales in general. The Motor Vehicles Act is concerned only with the automobile, and although the word "automobile" comes within the general term of "goods," automobiles are a special class of goods which have long been heavily regulated by public regulatory acts. In this connection, the official comment to section 25-2-401 seems to say that the Uniform Commercial Code makes no attempt to set out a specific line of interpretation where a public regulation is involved, but that in case a court should decide to apply this private law definition and reasoning to its public regulation, that there should be a clear and concise definitional basis for so doing. Such comment leads to the conclusion that the sales act, a private law, is not necessarily applicable to public regulations unless the court chooses to make it so.

In the case of *Food Stores v. Board of Alcoholic Control,* 268 N.C. 624, 151 S.E. 2d 582, it is stated:

> " 'Where there is one statute dealing with a subject in general and comprehensive terms, and another dealing with a part of the same subject in a more minute and definite way, the two should be read together and harmonized, if possible, with a view to giving effect to a consistent legislative policy; but, to the extent of any necessary repugnancy between them, the special statute, or the one dealing with the common subject matter in a minute way, will prevail over the general statute, according to the authorities on the question, unless it appears that the legislature intended to make the general act controlling; and this is true a fortiori when the special act is later in point of time, although the rule is applicable without regard to the respective dates of passage.' "

[7, 11]    The provisions of G.S. 20-72(b) contain specific, definite and comprehensive terms concerning the transfer of ownership of a motor vehicle. Conversely, the Uniform Commercial Code does not refer to transfer of ownership of motor vehicles, but only refers to the passing of title to property generally described as "goods." As applied to the framework of this case, G.S. 20-72(b) is a special statute and the Uniform Commercial Code is a general statute. Thus, the special statute, even though earlier in point of time, must prevail. Further, it is a cardinal rule of interpretation of statutes that the intent of the legislature controls. The North Carolina General Assembly has, by enacting G.S. 20-72, provided a specific and mandatory method of transferring ownership of a vehicle. Thereafter, it adopted a more general statute, the Uniform Commercial Code,

dealing with negotiable instruments, bills of lading, sales, and most types of personal property. The act contained a specific repealer as to ten previous separate acts of the General Assembly. The Motor Vehicles Act was not mentioned in the specific repealer. It would require a strained interpretation to hold that it was the intention of the General Assembly to repeal the provisions of G.S. 20-72 without a mention of this act in the specific repealer. Nor did the legislature intend to repeal the Motor Vehicles Act in the general repealer section.

The provisions of the Uniform Commercial Code do not override the earlier Motor Vehicle statutes relating to the transfer of ownership of motor vehicle for the purpose of tort law and liability insurance coverage.

The 1963 amendment was, in effect, a rewrite of G.S. 20-72(b) which clarified the provisions of the statute when liens are involved, made clear that the statute did not apply when foreclosure and repossession procedures are invoked, and deleted the requirement that application for certificate of title be made by the transferee before ownership to the vehicle passes.

[12] We hold that after 1 July 1963 (the effective date of the 1963 amendment) for purposes of tort law and liability insurance coverage, no ownership passes to the purchaser of a motor vehicle which requires registration under the Motor Vehicle Act of 1937 until (1) the owner executes, in the presence of a person authorized to administer oaths, an assignment and warranty of title on the reverse of the certificate of title, including the name and address of the transferee, (2) there is an actual or constructive delivery of the motor vehicle, and (3) the duly assigned certificate of title is delivered to the transferee. In the event a security interest is obtained in the motor vehicle from the transferee, the requirement of delivery of the duly assigned certificate of title is met by delivering it to the lien holder.

For the reasons stated, the result reached by the Court of Appeals is

Affirmed.